# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| KAREN MARIE M., | Case No. 2:20-CV-00416-DCN-REP |
| Plaintiff, | **REPORT AND RECOMMENDATION RE: PETITION FOR REVIEW** |
| vs. | **(Dkts. 1, 4 & 18)** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security[1], | |
| Defendant. | |

Pending is Petitioner Karen Marie M.'s Petition for Review (Dkt. 1) and an accompanying Memorandum of Law in support of the Petition for Review (Dkt. 18) appealing the Social Security Administration's final decision finding her not disabled and denying her claim for disability insurance benefits.  *See* Pet. for Rev. (Dkt. 1).  This action is brought pursuant to 42 U.S.C. § 405(g).  Having carefully considered the record and otherwise being fully advised, the Court enters the following Report and Recommendation.

## ADMINISTRATIVE PROCEEDINGS

Petitioner is a woman in her mid-fifties who alleges she became disabled on November 2, 2016, which is the date that Petitioner fell at work and suffered a right arm fracture.  AR[2] 15, 430, 432.  Petitioner filed her application for social security disability income ("SSDI") on May

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi will be substituted, therefore, as the respondent in this suit.  Fed. R. Civ. P. 25(d); *see also* 42 U.S.C. § 405(g).

[2] Citations to "AR __" refer to the cited page of the Administrative Record (Dkt. 17).

**REPORT AND RECOMMENDATION - 1**

10, 2017, six months after the fall and after undergoing surgery and treatment for the fracture. AR 15, 369-370. Petitioner initially alleged that she was disabled due to the combined effects of anxiety, depression, post-traumatic stress disorder ("PTSD"), and her right arm fracture. AR 210, 231, 238, 241. Later in the proceedings, however, around October 2018, Petitioner began complaining of more diffuse pain and alleging that she was disabled due to fibromyalgia. AR 252, 257. Petitioner's claim was denied initially and on reconsideration and Petitioner requested a hearing in front of an Administrative Law Judge ("ALJ"). AR 15. On September 11, 2019, the claim went to a hearing before Administrative Law Judge ("ALJ") Jesse Shumway. *Id.* On October 11, 2019, the ALJ issued a decision that was unfavorable to Petitioner. AR 15-26.

Petitioner appealed this decision to the Appeals Council. The Council denied Petitioner's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. AR 1-6.

Having exhausted her administrative remedies, Petitioner filed this case. Petitioner raises numerous points of error. First, Petitioner contends that the ALJ was legally required to include mental health limitations in the RFC because the ALJ found that Petitioner had mild limitations in various mental domains. Pt.'s Br. at 6-10 (Dkt. 18). Second, Petitioner maintains that the ALJ erred in finding that her irritable bowel syndrome was not a severe impairment. *Id.* at 11. Third, Petitioner argues that the ALJ wrongly concluded Petitioner's fibromyalgia was not a medically determinable condition without adequately developing the record. *Id.* at 11-12. Fourth, Petitioner asserts that the ALJ did not provide adequate justification for rejecting the opinions of the reviewing agency doctors regarding her mental health. *Id.* at 13-14. Fifth, Petitioner claims the ALJ failed to sufficiently discuss the opinions of two doctors – Dr. Stuart Denny and Dr. Connor W. Quinn – who treated Petitioner for injuries that she sustained in the

**REPORT AND RECOMMENDATION - 2**

November 2, 2016 fall.  *Id.* at 15.  Sixth, Petitioner claims that the ALJ inappropriately rejected

the opinions of her primary care physician, Dr. Richard K. Bell, regarding the extent of

Petitioner's pain.  *Id.* at 15-16.  Seventh, Petitioner faults the ALJ for failing to include any

limitations in the RFC related to her right arm fracture.  *Id.* at 16-17.  Eighth, and finally,

Petitioner argues that the ALJ erred in finding her past employment constituted "relevant work."

*Id.* at 17-19.[3]

## **STANDARD OF REVIEW**

To be upheld, the Commissioner's decision must be supported by substantial evidence

and based on proper legal standards.  42 U.S.C. § 405(g); *Trevizo v. Berryhill*, 871 F.3d 664 (9th

Cir. 2017).  Findings as to any question of fact, if supported by substantial evidence, are

conclusive.  42 U.S.C. § 405(g).  In other words, if there is substantial evidence to support the

ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *See*

*Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ludwig v.*

*Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012).  The standard requires more than a scintilla but less

---

[3] Petitioner's briefing alludes to, but does not preserve, the possibility of additional Step Two
challenges.  Specifically, in the issues section of the opening brief, Petitioner states that
"[r]emand is required because the ALJ's finding that 5 impairments were non-severe and an
additional 7 impairments were non-medically determinable was not supported by substantial
evidence."  Pt.'s Br. at 1 (Dkt. 18).  Petitioner only develops this argument, however, with regard
to three conditions: her irritable bowel syndrome, her fibromyalgia, and her mental health
conditions.  Petitioner does not cite to any evidence showing that the ALJ's treatment of her
other conditions was erroneous or prejudicial.  Petitioner, consequently, has waived the right to
challenge the ALJ's Step Two findings regarding these unnamed conditions.  *Arpin v. Santa*
*Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (issues which are not
specifically and distinctly argued and raised in a party's opening brief are waived).

**REPORT AND RECOMMENDATION - 3**

than a preponderance.  *Trevizo*, 871 F.3d at 674.  It "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the Court is to review the record as a whole to decide whether it contains evidence that would allow a person of a reasonable mind to accept the conclusions of the ALJ.  *Richardson*, 402 U.S. at 401; *see also Ludwig*, 681 F.3d at 1051.  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  *Treichler*, 775 F.3d at 1098.  Where the evidence is susceptible to more than one rational interpretation, the reviewing court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.  *Ludwig*, 681 F.3d at 1051.  In such cases, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ.  *Batson v. Comm'r of Social Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

The decision must be based on proper legal standards and will be reversed for legal error.  *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *Treichler*, 775 F.3d at 1098.  Considerable weight is given to the ALJ's construction of the Social Security Act.  *See Vernoff v. Astrue*, 568 F.3d 1102, 1105 (9th Cir. 2009).  However, this Court "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute."  *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## THE SEQUENTIAL PROCESS

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

**REPORT AND RECOMMENDATION - 4**

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is work activity that is both substantial and gainful.  20 C.F.R. §§ 404.1572, 416.972.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized.  20 C.F.R. §§ 404.1572(b), 416.972(b).  If the claimant is engaged in SGA, disability benefits are denied regardless of his or her medical condition, age, education, and work experience.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not engaged in SGA, the analysis proceeds to the second step.

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1522, 416.922.  If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  20 C.F.R. §§ 404.1520(c), 416.920(c).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are

awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal a listed impairment, the claim cannot be resolved at step three and the evaluation proceeds to step four.  20 C.F.R. §§ 404.1520(e), 416.920(e).

In the fourth step of the evaluation process, the ALJ decides whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. §§ 404.1545, 416.945.  An individual's past relevant work is work she performed within the last 15 years, or 15 years prior to the date that disability must be established, if the work was substantial gainful activity and lasted long enough for the claimant to learn to do the job.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014).  If the claimant can do such other work, he is not disabled; if the claimant cannot do other work and meets the duration requirement, he is disabled.

## THE ALJ'S FINDINGS

The ALJ found that Petitioner suffers one severe impairment: a fracture of her right wrist. AR 17.  The ALJ found that Petitioner also suffers a number of non-severe impairments, including irritable bowel syndrome, cervicothoracic spondylosis, obesity, minimal degenerative changes to her left hand, polysubstance abuse disorder, anxiety, and depression.  AR 17-18.  The

**REPORT AND RECOMMENDATION - 6**

ALJ determined that the combined effects of Petitioner's severe and non-severe impairments limit Petitioner's ability to work in a variety of manners, including that Petitioner cannot climb ladders, ropes, or scaffolds and can have no exposure to workplace hazards.  AR 20, 22.  Based on the testimony of a vocational expert, the ALJ concluded that these limitations would not prevent Petitioner from returning to her past work as a waitress, cashier checker, or floral salesperson.  AR 25-26.  The ALJ, therefore, found that Petitioner was not disabled.  AR 26.

## **DISCUSSION**

1. The Internal Consistency of the ALJ's Mental Health Findings

In her first argument on appeal, Petitioner maintains that because the ALJ found she had mild limitations in the four broad mental domains at Step Two, the ALJ was required to include restrictions in the RFC specifically targeted at Petitioner's mental functioning.  Pt.'s Br. at 6-10 (Dkt. 18).  In other words, Petitioners claims that the ALJ's Step Two findings inherently conflict with and invalidate the RFC.  This argument is unpersuasive.

Step Two is a "threshold determination" meant to weed out "weak claims."  *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017).  As it relates to mental health disorders, Step Two requires the ALJ to consider a claimant's functioning in four "broad" mental domains that encompass all or almost all human thought and activity.  20 C.F.R. §§ 404.1520a(c)(3).[4]  The

---

[4] To determine whether a mental health condition qualifies as severe at Step Two, the ALJ rates the claimant's degree of functional limitation across the following four domains: (i) understanding, remembering, and applying information, (ii) interacting with others; (iii) concentrating, persisting, and maintaining pace; and (iv) adapting or managing oneself.  20 C.F.R. §§ 404.1520a(b-c).  These areas are commonly referred to as the "paragraph B" criteria. AR 18.  The ALJ must rate the claimant's degree of limitation in these areas using a five-point scale: none, mild, moderate, marked, or extreme.  20 C.F.R. § 404.1520a(c)(4).

RFC, by contrast, focuses on how a specific individual's mental functioning impacts that person's ability to work.  20 C.F.R. § 404.1545(a)(1).

These are different inquiries.  The former looks at an individual's mental capacities from a "broad" and generalized perspective.  The latter asks how these capacities translate into an ability to work.  There is nothing inherently illogical about acknowledging a claimant's mild and non-disabling[5] limitations from the first viewpoint, but then concluding that these limitations do not restrict what a claimant can do at work.  *Gunderson v. Astrue*, 371 F. App'x 807, 809 (9th Cir. 2010) (unpublished) (explaining that Step Two "is a de minimis screening device to dispose of groundless claims" and holding that an "ALJ is not required, as a matter of law, to include all the limitations from the impairments the ALJ deems to be severe at step two in the ALJ's final RFC analysis"); *see also Buck*, 869 F.3d at 1048 (Step Two "is not meant to identify the [mental] impairments that should  be taken into account when determining the RFC") and *Bray v. Comm'r of Social Sec.*, 554 F.3d 1219, 1228-1229 (9th Cir. 2009) (noting that the petitioner had identified "no authority to support the proposition that a severe mental impairment must correspond to limitations on a claimant's ability to perform basic work activities").

In asking the Court to reach the contrary conclusion, Petitioner heavily relies on *Thomas v. Barnhart*, 278 F.3d 947 (9th Cir. 2002).  Pt.'s Rply at 2-4 (Dkt. 20).  Petitioner reads *Thomas* as requiring ALJs to incorporate into the RFC any and all limitations the ALJ recognized at Steps Two and Three, no matter how mild these limitations may be.  *Id.* at 2-3.  The facts and reasoning of *Thomas*, however, do not sustain such an expansive reading.  In *Thomas*, an

---

[5] In this case, for example, the ALJ rated Petitioner's mental limitations in each of the "paragraph B" domains as "mild."  AR 18-19.  Had Petitioner not had any physical impairments, this would have ended the analysis with a presumptive finding of non-disability.  *See* 20 C.F.R. § 404.1520(c) and 404.1520a(d)(1).

**REPORT AND RECOMMENDATION - 8**

impartial medical expert testified at the claimant's disability hearing.  This expert opined that the claimant "often" experienced deficiencies of concentration, persistence, or pace.  *Thomas*, 278 F.3d. at 953.  The ALJ adopted these findings and asked the vocational expert to credit the doctor's opinions.  *Id.* at 953-954, 956.  On appeal, the claimant argued that the ALJ erred in not expressly restating the limitations on concentration, persistence, or pace in the hypothetical the ALJ asked the vocational expert.  *Id.* at 956.  The Ninth Circuit rejected this argument.  The Ninth Circuit found that the ALJ adequately incorporated the claimant's mental limitations into the hypothetical by reference to the testifying doctor's opinions.  *Id.*  In reaching this holding, the Ninth Circuit did not address how or when an ALJ's Step Two findings must be incorporated into the RFC.  *Id.*

To the extent it sheds any light on this issue, *Thomas* is easily distinguishable.  The mental restrictions at issue in Thomas were more pervasive than those at issue here.  In *Thomas*, the ALJ accepted that the claimant "often" had lapses in concentration, persistence, or pace.[6] The question presented here, by contrast, is whether a claimant with *mild* limitations in certain mental domains must necessarily and always have some corresponding reduction in her work abilities.

The parties each cite several out-of-state district court decisions to support their differing answers to this question.  Pt.'s Rply at 3 (Dkt. 20) and Res.'s Br. at 5 (Dkt. 19).  Having reviewed these cases and considered the relevant Ninth Circuit law, the undersigned concludes

---

[6] Prior to 2000, the regulations required ALJ's to assess deficiencies in a claimant's concentration, persistence, or pace on a frequency continuum with "often" falling in the middle of a five-point scale: never, seldom, often, frequent, and constant. 20 C.F.R. § 404.1520a(b)(3) (1992).  A finding of "often" under the old scale, therefore, represented a similar ranking to a finding of "moderate" under the current five-point severity scale. *Compare* 20 C.F.R. § 404.1520a(b)(3) (1992) with 20 C.F.R. § 404.1520a(c)(4) (2017).

**REPORT AND RECOMMENDATION - 9**

that the weight of the authority, including many of the cases cited by Petitioner, strongly supports the conclusion that ALJ is <u>not</u> required to incorporate mild psychological limitations into the RFC unless the ALJ finds that these limitations erode the claimant's ability to work.

First, at least three Ninth Circuit panels have issued unpublished decisions affirming that even severe mental impairments do not erode a claimant's RFC as a matter of law. *See Maher v. Comm'r of Social Sec.*, 474 F. App'x 609, 609 (9th Cir. 2012) (unpublished) ("The [ALJ's] finding that [the claimant] presented with a severe mental impairment at step two of the sequential analysis did not compel inclusion of those findings in the residual functional capacity (RFC) determination at step five of the analysis."); *Thomas v. Comm'r of Social Sec.*, 480 F. App'x 462, 463 (9th Cir. 2012) (unpublished) (a severe impairment need not necessarily correspond to limitations on a claimant's ability to perform basic work activities); *Gunderson*, 371 F. App'x at 809 (unpublished) (same).[7]

---

[7] The out-of-circuit appellate cases Petitioner identifies to support her position, which all involve moderate findings of impairment, accord with this Ninth Circuit law. Specifically, Petitioner cites *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011), and *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3rd Cir. 2004). Pt.'s Br. at 6 (Dkt. 18). Contrary to Petitioner's suggestion, these cases do not adopt a rigid rule mandating that restrictions be incorporated into the RFC reflecting all moderate mental health limitations. *Mascio*, 780 F.3d at 638 (acknowledging that an ALJ may be able to explain why a claimant's moderate limitation in concentration, persistence, or pace, found at Step Three, does not translate into a limitation in that claimant's RFC); *Winschel*, 631 F.3d at 1181 (reversing the ALJ's decision where the ALJ found moderate mental limitations at Step Two and neither accounted for the limitation in the RFC nor "indicated that medical evidence suggested [that the claimant's] ability to work was unaffected by this limitation"); *Ramirez*, 372 F.3d at 555 (recognizing that "there may be a valid explanation" for the omission of Step Two psychiatric review technique form findings from an hypothetical summarizing the RFC, where, for example, the ALJ concludes that a claimant's "deficiency in pace was so minimal or negligible that . . . it would not limit her ability to perform simple tasks under a production quota"); *see also Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (clarifying that *Mascio* "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC").

**REPORT AND RECOMMENDATION - 10**

Second, the majority of district courts to face the question presented here have found that mild mental limitations are not presumptively indicative of restrictions in a claimant's work abilities. *See*, *e.g.*, *Richardson v. Saul*, 511 F. Supp. 3d 791, 799 (E.D. Ky. 2021) ("not every mild or moderate limitation signifies a compromised work ability")*; Jann B. S. v. Kijakazi*, No. 4:20-CV-00354-CWD, 2021 WL 4005986, at *9 (D. Idaho Sept. 2, 2021) (where the ALJ found that the petitioner's "mild mental limitations were not sufficiently severe to limit her ability to work at the sedentary exertional level," the ALJ did not err in declining to include a limitation in the RFC specifically accounting for these Step Two findings); *Sanguras v. Saul*, No. 1:19-CV-1036 JLT, 2021 WL 973940, at *4-5 (E.D. Cal. Mar. 16, 2021) (same); *Fackler v. Saul*, No. 3:20-CV-00790, 2021 WL 3493511, at *8 (N.D. Ohio July 16, 2021), report and recommendation adopted, No. 3:20-CV-790, 2021 WL 3492129 (N.D. Ohio Aug. 9, 2021) (explaining that courts in the Sixth Circuit have "routinely rejected" the argument that a finding of mild mental limitations at Step Two must be included in the RFC as a matter of law); *Henderson v. Saul*, No. CV 20-02045, 2021 WL 3508495, at *7 (E.D. La. July 13, 2021), report and recommendation adopted, No. CV 20-2045, 2021 WL 3362933 (E.D. La. Aug. 3, 2021) (refusing to find that the "omission of mild mental functional limitations is absolute legal error when the issue involves returning to semi-skilled or skilled past relevant work"); *Ray v. Comm'r of Social Sec.*, No. CV-19-05821-PHX-JJT, 2020 WL 6779040, at *2 (D. Ariz. Nov. 18, 2020) (where a claimant's mental limitations cause "no more than a minimal effect on [the claimant's] ability to work," an ALJ may be "justified in not including any mental limitations in [the claimant's] RFC"); *Mary G. v. Berryhill*, No. 0:17-CV-03436-KMM, 2019 WL 1130173, at *4-5 (D. Minn. Mar. 12, 2019) (same); *Nolen v. Berryhill*, No. 416CV00153SEBDML, 2017 WL 3575822, at *6 (S.D. Ind. July 26, 2017), report and recommendation adopted, No.

**REPORT AND RECOMMENDATION - 11**

416CV00153SEBDML, 2017 WL 3535202 (S.D. Ind. Aug. 17, 2017) ("Importantly, the fact the ALJ concluded for purposes of step two that Ms. Nolen's mental impairment was properly rated as 'mild' and not 'none' in the categories of daily living activities, social functioning, and CPP does not mean that an RFC must include mental functioning limitations").

As these cases illustrate, what is required of the ALJ in drafting the RFC is *consideration* of a claimant's mild mental health limitations, not universal and inevitable *incorporation* of these limitations into the RFC.  *See Taylor v. Berryhill*, No. CV 17-11444, 2018 WL 3887521, at *6 (E.D. Mich. July 5, 2018), report and recommendation adopted, No. 17-CV-11444-DT, 2018 WL 3870066 (E.D. Mich. Aug. 15, 2018) (explaining that the authorities requiring an ALJ  "to consider the functional effects of non-severe impairments when formulating an RFC" do not mandate that an ALJ "account for" all non-severe "paragraph B" mental limitations by including some particular mental limitation in the RFC).

The ALJ's decision satisfied this standard.  In crafting the RFC, the ALJ expressly discussed and considered the evidence regarding Petitioner's mental health limitations.  AR 23, 25.  To reflect the combined effect of Petitioner's various non-severe impairments, which included anxiety and depression, the ALJ restricted Petitioner from any exposure to environmental agents or to "workplace hazards such as unprotected heights or dangerous moving mechanical parts."  AR 22.   The ALJ concluded, however, that Petitioner's basic mental functioning was intact and that her psychiatric symptoms had resolved.  AR 23.  The ALJ therefore elected not to incorporate any additional limitations into the RFC that focused on Petitioner's mental abilities, such as her cognition, attention, or social skills.  AR 20.  As will be discussed in more detail below, Petitioner has shown no error in this portion of the ALJ's reasoning or in the ALJ's treatment of the mental health evidence.

**REPORT AND RECOMMENDATION - 12**

2. <u>Petitioner's Irritable Bowel Syndrome</u>

Petitioner's second argument on appeal is that the ALJ erred in finding that her irritable bowel syndrome was not a severe impairment. Pt.'s Br. at 11 (Dkt. 18). Even if the ALJ erred in this regard, Petitioner has not shown that the error was harmful. In the social security context, reversal on account of error is not "automatic," but requires a "case-specific" determination of prejudice. *Ludwig*, 681 F.3d at 1053.

Where, as here, Step Two is decided in the claimant's favor, any error in finding an impairment not severe is harmless and cannot be the basis for remand unless the petitioner shows that the ALJ's alleged error extended beyond the Step Two findings and infected the RFC. *Buck*, 869 F.3d at 1049; *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (any error in failing to find an impairment severe at step two is harmless if the ALJ properly considers any resulting limitations in assessing the claimant's RFC).

Petitioner has presented no argument that she was prejudiced in this manner. Specifically, Petitioner has identified no functional limitations caused by her irritable bowel syndrome that the ALJ should have but did not include in the RFC. This is fatal to her challenge on appeal. *See Burch*, 400 F.3d at 683-684 (holding that even if the ALJ erred in concluding a petitioner's obesity was not severe, this error did not require reversal because the petitioner did not "point[] to any evidence of functional limitations due to obesity" which were wrongly omitted from the RFC).

To the extent Petitioner's brief discussion of the evidence can be construed as an attempt to make this showing, it is uncompelling. Petitioner emphasizes that she sought emergency treatment for abdominal pain more than once during the period of alleged disability. Pt.'s Br. at

**REPORT AND RECOMMENDATION - 13**

11 (Dkt. 18).  By the undersigned's count, the medical record contains eight such visits (three before and five after Petitioner's disability onset date).  These visits are summarized below:

- On July 24, 2016, Petitioner went to the emergency room complaining of foot pain and abdominal pain, which had triggered an anxiety attack.  AR 658.  Petitioner reported a history of irritable bowel syndrome, but denied fever, nausea, vomiting, dysuria, or diarrhea.  *Id.*  After mostly normal diagnostic tests, the emergency room doctor concluded Petitioner was experiencing exacerbation of her irritable bowel syndrome.  AR 660-661.  The doctor gave Petitioner pain and anxiety medication and discharged her home with instructions to follow up with her primary care doctor.  *Id.*

- On July 27, 2016, three days later, Petitioner returned to the emergency room complaining of abdominal pain.  AR 651.  Petitioner once again denied nausea, vomiting, or urinary symptoms, but reported a high level of pain.  *Id.*  Upon a review of Petitioner's medical records, the doctor noticed that Petitioner's records revealed that she was receiving pain medication "from various different doctors, which she denied."  AR 653.  The doctor called Petitioner's primary care provider and "spoke with a nurse who agreed that [Petitioner was] drug seeking."  *Id.*  The doctor gave Petitioner Toradol for pain, but Petitioner "continued to request further pain medication."  *Id.*  The doctor denied these requests and eventually discharged Petitioner home in a stable condition.  AR 653-654.

- On August 1, 2016, Petitioner returned to the emergency room reporting "constant, worsening abdominal pain."  AR 606.  Petitioner also reported psychiatric symptoms related, at least in part, to benzodiazepine withdrawal.  *Id.*  The doctor wrote that "[d]ue to [Petitioner's] history of opiate abuse, she was denied narcotics at this time

**REPORT AND RECOMMENDATION - 14**

for her pain, but makes repeated requests." AR 608. After an evaluation, Petitioner was admitted to the hospital for inpatient psychiatric care. *Id.* This care lasted from August 1, 2016 through August 28, 2016. AR 616. During this period, Petitioner was diagnosed with depression, PTSD, severe opioid use disorder, severe alcohol use disorder, severe benzodiazepine use disorder, and chronic back and shoulder pain. AR 617. At the beginning of her hospitalization, Petitioner reported constipation and abdominal pain, but these symptoms had improved by the time of her discharge. AR 626, 628, 643, 645.

- On March 6, 2017, Petitioner went to the emergency room complaining of chest pain and abdominal pain. AR 559. Petitioner denied fever, nausea, or vomiting. *Id.* After receiving mostly normal tests, the doctor concluded that Petitioner did not have an acute cardiac problem and was more likely experiencing symptoms of anxiety and irritable bowel syndrome. AR 562. Petitioner was given anxiety medication and aspirin and discharged home. AR 561-562.[8]

- On April 25, 2017, Plaintiff went the hospital complaining of abdominal pain. AR 707. Petitioner denied fever, nausea, vomiting, diarrhea, or dysuria. *Id.* Doctors noted that she had been discharged from inpatient psychiatric and alcohol abuse treatment seven days earlier with medications for constipation. *Id.* Doctors treated Petitioner's continuing constipation with manual disimpaction. AR 709. A doctor offered Petitioner further disimpaction an hour later, but Petitioner refused. *Id.*

---

[8] Later that month, Petitioner returned to inpatient treatment for a relapse of her substance abuse disorders. AR 555. Her treating providers noted that she "[i]nitially" engaged "in a moderate amount of medication seeking" and would "often over report her symptoms." *Id.* On April 18, 2017, at the time of her discharge from the program, Petitioner's prognosis was rated as "guarded." AR 555-556.

**REPORT AND RECOMMENDATION - 15**

Petitioner requested narcotics.  The doctor denied this request because he felt narcotics would only worsen Petitioner's constipation.  *Id.*  Petitioner was discharged with instructions to follow up with her primary care doctor.  AR 711.

- On June 6, 2017, Petitioner went to the emergency room with reports of chest pain, abdominal pain, and "upper epigastric" spasms that she associated with her irritable bowel syndrome.  AR 699.  Petitioner did not have any nausea, vomiting, or diarrhea. *Id.*  Notes from this record state that Petitioner "was regularly requesting pain medication, which [the doctor did] not feel [was] indicated at [that] time."  AR 701. The doctor also wrote that "while waiting for imaging studies to be performed," Petitioner "stated that she would like to leave if she was not going to receive pain medication." *Id.*[9]

- On December 12, 2018, almost a year and a half later, Petitioner returned to the hospital due to back pain and abdominal pain.  AR 939.  Petitioner explained that she had episodes of this type of pain "1-2 times per year" for which she normally took hydrocodone.  *Id.*  Petitioner explained that she was coming in for treatment because she ran out of hydrocodone at home.  *Id.*  Petitioner denied fever, vomiting, constipation, diarrhea, or dysuria.  *Id.* Petitioner was provided with pain medication and discharged home without labs or imaging.  AR 941.

- On February 27, 2019, Petitioner went to the hospital a final time reporting abdominal pain.  AR 943.  Petitioner said she was nauseous and had vomited, but

---

[9] Only a few weeks after this visit, Petitioner checked herself back into the hospital's chemical dependency unit for substance abuse treatment.  AR 688.  Petitioner ultimately left the inpatient program against medical advice.  *Id.*  At the time of her discharge, Petitioner's treating doctor diagnosed Petitioner with depression, chronic pain, and severe alcohol and opioid use disorders. *Id.*  He rated Petitioner's prognosis as "poor to very poor."  *Id.*

**REPORT AND RECOMMENDATION - 16**

denied diarrhea.  *Id.*  Imaging showed signs of constipation.  AR 946.  Petitioner was

given small amounts of pain and anxiety medication.  *Id.*  The doctor wrote that:

"[u]pon preparation for discharge, [Petitioner] asked both myself and my attending

provider multiple times for prescriptions of narcotic and benzodiazepine medications.

At one point she went to far as to stop my progress in the hallway of the department,

begging for hydrocodone 'just ten, please!'"  *Id.*  At least two doctors explained that

opioids were not optimal treatment for Petitioner's chronic conditions.  Petitioner

"then abruptly left, pulling out her own IV and walking to the waiting room where

nurses [were] finally able to intervene, dress the IV site and give discharge

instructions."  *Id.*

Even if construed in the manner most favorable to Petitioner, the best these records show is that

Petitioner has been diagnosed with irritable bowel syndrome and struggles with recurrent

constipation and associated abdominal pain, with more serious flare ups one to three times a

year.  In other words, the only potential functional limitation related to Petitioner's irritable

bowel syndrome that is apparent or documented in the record is intermittent pain.[10]

The ALJ, however, expressly considered Petitioner's claims of pain in crafting the RFC.

At this step in the sequential analysis, ALJ acknowledged that Petitioner claimed to be disabled

due to "all over" body pain caused by fibromyalgia and irritable bowel syndrome.  AR 21.  The

ALJ proceeded to give specific reasons for rejecting Petitioner's reports of disabling body pain,

---

[10] In her Reply, Petitioner suggests that the ALJ ignored unspecified "objective findings" related
to her irritable bowel syndrome.  Pt.'s Rply at 5 (Dkt. 20).  Petitioner never identifies what these
alleged findings were.  Having reviewed the record, the undersigned could not locate any
medical findings or opinions indicating that Petitioner's irritable bowel syndrome caused any
particular work-related functional limitations other than pain.

**REPORT AND RECOMMENDATION - 17**

including Petitioner's well-documented history of drug seeking.  AR 23.  Petitioner has not

challenged this reasoning[11] or shown that her irritable bowel syndrome caused any other

limitations that the ALJ failed to consider.  In these circumstances, a Step Two error is harmless.

*See Yanchar v. Berryhill*, 720 F. App'x 367, 370 (9th Cir. 2017) (unpublished) (finding that a

petitioner had not shown she was harmed by the ALJ's classification of her depression as non-

severe, where the petitioner pointed to evidence that she was diagnosed with depression but did

not "identify any functional limitations stemming from" the diagnosis that the ALJ had failed to

consider as part of the RFC).

   3.   The ALJ's Treatment of Petitioner's Fibromyalgia

     Petitioner's third argument is that the ALJ erred at Step Two in determining that

fibromyalgia was not one of her medically determinable impairments.  A medically determinable

impairment is an impairment that results from "anatomical, physiological, or psychological

abnormalities" and has been established by "objective medical evidence from an acceptable

medical source."  20 C.F.R. § 404.1521.

     Here, the entirety medical evidence discussing Petitioner's alleged fibromyalgia is

contained in five records.  First, on October 4, 2018, Petitioner met with her primary care

provider, Dr. Richard K. Bell, to discuss fibromyalgia.  AR 927.  Petitioner told Dr. Bell that she

had been diagnosed with fibromyalgia eight years prior while living in Las Vegas.[12]  She claimed

---

[11] Nor would such a challenge be successful.  The record is replete with evidence, some of which
is outlined above, supporting the ALJ's determination that Petitioner's polysubstance abuse
disorder and related behavior "casts doubt on the claimant's reports of pain to medical providers,
suggesting such reports were likely motivated by a desire to obtain narcotic drugs rather than by
genuine pain."  AR 23.

[12] There is nothing in the medical record to support this claim.  Petitioner does not identify, and
the undersigned could not locate any other medical records prior to October 2018 indicating that
Petitioner had a history of fibromyalgia.

**REPORT AND RECOMMENDATION - 18**

that other medical providers had occasionally given her hydrocodone to treat her condition and

that this was helpful.  Petitioner requested hydrocodone from Dr. Bell and assured him she did

"not abuse the medication" and did not "desire to take it on a regular basis."  *Id.*  Dr. Bell

conducted a basic physical exam of Petitioner that revealed no abnormal findings.  AR 928

(noting that Petitioner was not in distress and documenting only normal physical and psychiatric

conditions).  Dr. Bell then consulted with Petitioner about her concerns of having fibromyalgia.

*Id.*  During this discussion, Dr. Bell informed Petitioner that no specialists in the area were

seeing patients for fibromyalgia.  *Id.*  Dr. Bell told Petitioner the only effective treatment was

"vigorous exercise" and encouraged Petitioner to engage in this regularly.  AR 928-929.  Dr. Bell

explained that narcotic medications were "not indicated for fibromyalgia."  *Id.*  Despite this

warning, Dr. Bell agreed to give Petitioner a "small amount of hydrocodone" for breakthrough

pain.  *Id.*  In the assessment portion of the form, Dr. Bell indicated that he had seen Petitioner for

fibromyalgia, low back pain, and asthma.  AR 929.

Second, Petitioner saw Dr. Bell one additional time for fibromyalgia, on January 8, 2019.

AR 930.  During this visit, Petitioner reported pain in the upper parts of her body, which limited

her activities, but denied pain in the lower part of her body.  *Id.*  She stated she was having four

"horrible" days per month, during which she was taking hydrocodone.  *Id.*  Petitioner told Dr.

Bell she was no longer able to work due to pain.  *Id.*  Dr. Bell did a basic physical exam with

normal findings.  AR 931.  He encouraged Petitioner to continue engaging in regular exercise,

renewed her hydrocode prescription, and filled out a clinical assessment of pain for Petitioner to

use in her disability case.  AR 914, 932.  Oddly, this assessment listed "general activity" not

fibromyalgia or any other condition as the underlying impairment that caused Petitioner's pain.

AR 914.

**REPORT AND RECOMMENDATION - 19**

Third, on March 19, 2019, Petitioner saw Certified Physician Assistant John Melgaard for a medication check. AR 963. PA-C Melgaard is a physician assistant who worked at the same clinic as Dr. Bell and saw Petitioner at various times between 2015 and 2019. *See generally* AR 730-894. PA-C Melaard's treatment records relate to a variety of conditions, including colds, falls, mental health issues, and back pain. *Id.* Notably, the first time PA-C saw Petitioner for fibromyalgia appears to be March 19, 2019. During this visit, Petitioner reported that she had a "flare" of her fibromyalgia and low back pain following a fall on some ice. AR 963. PA-C Melgaard diagnosed Petitioner with low back pain, but not fibromyalgia. AR 964. PA-C Melgaard refilled Petitioner's prescription for hydrocodone. AR 964-965.

Fourth, on July 8, 2019, PA-C Melgaard completed a "Fibromyalgia Medical Source Statement" for Petitioner. AR 986-991. On this form, PA-C Melgaard indicated that Petitioner met the 1990 American College of Rheumatology Criteria for fibromyalgia. AR 986. PA-C Melgaard documented the symptoms he associated with Petitioner's fibromyalgia and completed a diagram showing where Petitioner had tender points. AR 988. PA-C Melgaard represented that Petitioner had suffered from fibromyalgia for seven years. *Id.*

Fifth, and finally, the ALJ engaged the services of a medical expert, Dr. Minh D. Vu, to review the record and provide opinions about Petitioner's medical conditions. AR 999-1007. Dr. Vu opined that fibromyalgia was "not yet" a medically determinable impairment. AR 1005. Dr. Vu explained that while PA-C Melgaard had mapped tender points, no medical professional had ruled out mimicking diseases such as lupus, rheumatoid arthritis, or multiple sclerosis. *Id.*

Based on this record, the ALJ found that fibromyalgia was not a medically determinable impairment for Petitioner. AR 19, 24. In reaching this conclusion, the ALJ acknowledged PA-C Melgaard's Fibromyalgia Medical Source Statement, but concluded that

**REPORT AND RECOMMENDATION - 20**

PA-C Melgaard was not an acceptable medical source qualified to diagnose fibromyalgia under the social security regulations and rulings.  AR 24.  Petitioner does not and cannot dispute that this finding is correct.  "A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide" evidence to establish that a claimant has fibromyalgia.  Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).

That only leaves Dr. Bell.  As it pertains to Dr. Bell, the ALJ made the following findings.  First, the ALJ concluded that Petitioner's fibromyalgia was not a medically determinable impairment because no provider, including Dr. Bell, conducted an "exclusionary analysis to rule out other pathology as the cause of [Petitioner's] symptoms."  AR 19.  Second, the ALJ indicated that she saw Dr. Bell's comments about Petitioner's desire for hydrocodone as contradicting rather than supporting Petitioner's claim to have fibromyalgia.  AR 19-20.  Petitioner claims the ALJ's analysis was wrong.  Specifically, Petitioner insists that Dr. Bell diagnosed her with fibromyalgia and that this fact either required the ALJ to find that fibromyalgia was medically determined or required the ALJ to order further testing of Petitioner's condition.

Petitioner's argument incorrectly presumes that the only evidence a claimant needs to present to satisfy her burden of showing she has a medically determinable condition is a medical record signed by an acceptable medical source listing that condition as a diagnosis.  This is incorrect.  To be medically determinable, a physical or mental impairment must be established by objective medical evidence, such as "acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1521.  A mere "statement of symptoms, . . . diagnosis, or . . . medical opinion" is not enough.  *Id.*

**REPORT AND RECOMMENDATION - 21**

In 2012, the Social Security Administration issued a ruling detailing how to apply this regulation to cases involving fibromyalgia.  SSR 12-2p, 2012 WL 3104869.  This ruling adopts two alternative sets of criteria for diagnosing fibromyalgia: (i) the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and (ii) the 2010 American College of Rheumatology Preliminary Diagnostic Criteria.  *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) (citing SSR 12-2p, 2012 WL 3104869, at * 2-3).  The ruling stresses that deciding whether a claimant has satisfied these criteria does not depend "upon the physician's diagnosis alone."  SSR 12-2p, 2012 WL 3104869, at *2. The physician must review the person's medical history, conduct a physical exam, and document how this history and exam show that the claimant meets the above criteria.  *Id.*  ("We will find that a person has an MDI of FM if the physician diagnosed FM <u>and</u> provides . . .  evidence we describe in section II.A. or section II. B.") (emphasis added).

Dr. Bell's records are completely lacking in such clinical findings.  During his consultation with Petitioner, Dr. Bell did not explore or document the location of Petitioner's pain or make any findings that Petitioner's pain is indeed "widespread" – "that is, pain in all quadrants of the body."  *Compare* SSR 12-2p, 2012 WL 3104869, at *2-3 with AR 927-929.  As for the second criteria, Dr. Bell did not digitally palpate or test Petitioner's tender-point sites.  Nor did he review her longitudinal medical history and note the "[r]epeated manifestations of six or more" fibromyalgia symptoms.  *Id.*  Finally, as the ALJ noted, Dr. Bell did not conduct any testing or analysis to rule out any other possible explanations for Petitioner's symptomology.[13]

---

[13] As far as the written records reflect, at no point in the visit did Petitioner disclose or Dr. Bell inquire about or acknowledge Petitioner's history of severe opioid abuse disorder, which had led to Petitioner seeking inpatient substance abuse treatment four different times in 2016 and 2017. AR 927-929.  This is striking.  The discharge records from Petitioner's substance abuse treatment indicate that Petitioner suffered severe and longstanding substance abuse disorders.

**REPORT AND RECOMMENDATION - 22**

*Id.* The ALJ did not err in finding that these records failed to establish Petitioner has fibromyalgia.

The only remaining question is whether the ALJ had an independent duty to order additional evaluation or testing to determine the etiology of Petitioner's pain even if the record did not establish that Petitioner had fibromyalgia.

"In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). This duty exists whether the claimant is represented by counsel or appearing pro se. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). As a general matter, this duty requires the ALJ to gather the relevant medical records, hold a hearing to explore the facts and make credibility determinations, and develop the arguments for and against granting benefits. *Brown*, 713 F.2d at 443; *Sims v. Apfel*, 530 U.S. 103, 111 (2000). It may also extend to soliciting additional medical testimony or opinions where a doctor's records are unclear. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). A duty to further develop the record in this manner is only triggered, however, when there is "ambiguous evidence" or the ALJ has found "the record inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001).

The ALJ did not shirk her responsibilities under this line of case law. Unlike in *Tonapetyan*, the medical expert on whom the ALJ relied – Dr. Vu – did not express "concern

---

AR 555-556, 582-583, 6616-617, and 88-689. At one point during her treatment, Petitioner even reported that opiates were her drug of choice, she had been abusing them for 15 years, and that she would sometimes take "upwards of 60" tablets of them a day. AR 639. Only two months before Dr. Bell's fibromyalgia assessment Petitioner threatened to stop seeing him because he had refused to refill her pain medication. AR 883.

**REPORT AND RECOMMENDATION - 23**

over the lack of a complete record" or equivocate about the invalidity of Petitioner's

fibromyalgia diagnosis. *Tonapetyan*, 242 F.3d at 1150 -1151.  To the contrary, Dr. Vu affirmed

that there was sufficient objective medical evidence for him to form an opinion about the nature

and severity of Petitioner's impairments.  AR 1005.  In addition, the record unambiguously

indicated that no acceptable medical source had properly evaluated Petitioner and determined she

met the accepted criteria for fibromyalgia.

Requiring the ALJ to generate such evidence would "improperly shift" Petitioner's

burden to show she had fibromyalgia onto the ALJ.  *See Mayes*, 276 F.3d at 459 (holding that the

ALJ had no duty to develop the record by diagnosing the claimant's herniated discs).  Even if the

Court had this power, this is not the easy undertaking Petitioner suggests.  For many years,

fibromyalgia has been "poorly-understood within much of the medical community."  *Benecke v.*

*Barnhart*, 379 F.3d 587, 591 (9th Cir. 2004).  Before diagnosing fibromyalgia, a physician is

required to rule out other possible causes for a person's pain, including other rheumatic diseases,

neurological disorders, or mental health problems.  *See* SSR 12-2p, 2012 WL 3104869, at *3 ("it

is common in cases involving FM to find evidence of examinations and testing that rule out other

disorders that could account for the person's symptoms and signs. Laboratory testing may

include imaging and other laboratory tests (for example, complete blood counts, erythrocyte

sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)").  None of

the cases Petitioner cites have required the Social Security Commissioner to assume the

responsibility for such wide-ranging, exploratory evaluations, testing, and laboratory techniques.

Where the basic evidence necessary to diagnosis a condition is absent, it is the claimant not the

ALJ who carries the burden of developing that evidence.  *Mayes*, 276 F.3d at 459-460; *see also*

*Hamilton v. Colvin*, No. 3:15-CV-00859-BR, 2016 WL 2757975, at *5 (D. Or. May 12, 2016) (the ALJ did not have a duty to develop the record with regard to fibromyalgia where the record did "not contain evidence sufficient to establish" fibromyalgia under SSR 12-2p); *Lizarraga v. Berryhill*, No. 16-CV-06561-BLF, 2018 WL 827895, at *7 (N.D. Cal. Feb. 12, 2018) ("[T]his is not a case in which the evidence was ambiguous or the record was inadequate to allow for evaluation of the evidence. There simply was a failure of proof on Plaintiff's part with respect to the claimed impairment of fibromyalgia. Plaintiff's failure of proof was not sufficient to trigger the ALJ's duty to develop the record."). Petitioner's arguments to the contrary are unpersuasive.

   4.   <u>The ALJ's Treatment of the Mental Health Evidence</u>

Petitioner's fourth argument is that the ALJ erred in rejecting the opinions of the consulting agency doctors – Dave Sanford Ph.D. and Mack Stephenson Ph.D. – regarding the extent of Petitioner's mental health limitations. As Petitioner emphasizes, Dr. Sanford and Dr. Stephenson are the only medical professionals who explicitly evaluated Petitioner's mental health according to the paragraph B criteria. Based on their review of the record, both Dr. Sandford and Dr. Stephenson concluded that Petitioner was moderately limited in her ability to interact with others and maintain concentration, persistence, and pace. AR 69, 88. They agreed that these limitations stemmed from Petitioner's history of depression, anxiety, and substance abuse disorders. AR 74, 93.

Petitioner contends that the ALJ was not at liberty to reject these opinions and replace them with the ALJ's own interpretation of the mental health evidence. This argument runs counter to binding Ninth Circuit law. It is well-settled that it is the ALJ's responsibility to determine the credibility of the medical evidence. *Thomas*, 278 F.3d at 958. While that does not give ALJs free rein to disregard medical testimony, neither is such testimony automatically

controlling.  For example, the Ninth Circuit has long permitted ALJs to reject the

"uncontradicted" opinion of a treating doctor where the ALJ identifies "clear and convincing

reasons that are supported by substantial evidence."  *Ryan v. Comm'r of Social Sec.*, 528 F.3d

1194, 1198 (9th Cir. 2008).  This was the case even under the old regulations[14] where treating

doctors were accorded the highest level of deference.  *Id.* at 1205; *see also Magallanes v. Bowen*,

881 F.2d 747, 751 (9th Cir. 1989) (explaining that even the opinions of treating doctors were not

"necessarily conclusive").  It follows that the opinions of agency doctors, which are entitled to

no particular intrinsic deference, may also be rejected in appropriate circumstances.  The proper

question is not whether the ALJ relied on her own "lay" assessment of Petitioner's functioning,

but whether the ALJ gave legitimate reasons, supported by substantial evidence, for rejecting the

agency doctors' opinions and finding that Petitioner had only mild mental health limitations.

     The undersigned agrees with Respondent that the Petitioner has not shown error under

these standards.  As required by 20 C.F.R. § 404.1520c, the ALJ considered the persuasiveness

of Dr. Sandford and Dr. Stephenson's opinions and articulated how supportable and consistent

he found the opinions under 20 C.F.R. § 404.1520c(b)(2).  AR 25.  This portion of the ALJ's

opinion reads as follows:

> Neither consultant personally examined the claimant to support their opinions, and their
> opinions are not consistent with the objective evidence.  A longitudinal review of the
> record shows that upon objective mental status examination, the claimant repeatedly
> documented alert and oriented cognition, normal judgment and insight, normal memory
> function, and no signs of acute psychological distress (Ex. 6F/45; 8F/8; 9F/1; 10F/157;
> 12F/10; 14F/13; 15F/2, 6; 16F/18-19).  In fact, In June 2019, the claimant reported to
> medical staff that she suffered from minimal or no depression, and that she required no
> medical help for treating depression symptoms.  (Ex. 16F/18).  Such evidence is highly
> inconsistent with the opinion that the claimant has experienced moderate limitations in

---

[14] On January 18, 2017, the Social Security Administration published comprehensive revisions to
its regulations governing the evaluation of medical evidence.  *See* 82 Fed. Reg. 5844.  These
amendments apply to claims, such as Petitioner's, that are filed on or after March 27, 2017.  *See*
20 C.F.R. § 404.1520c.

**REPORT AND RECOMMENDATION - 26**

her mental functioning resulting from depression or anxiety.  As such, I find these opinions unpersuasive.

AR 25.  The ALJ also provided more detailed discussions of the evidence at Step Two to explain why the ALJ believed the mental health evidence from treating providers showed that Petitioner had only mild mental health limitations.  AR 18-19 (explaining, among other things, that "when the claimant was sober, objective examinations documented a completely normal mood and affect, a cooperative demeanor, alert and oriented cognition, and no objective deficits in the claimant's mental or interpersonal functioning); *see also* AR 23 (reiterating at Step Four that Petitioner's "past contemporaneous reports to medical providers . . demonstrate that her psychiatric symptoms have resolved").

Petitioner largely ignores this analysis and makes no attempt to explain why the records the ALJ cites do not constitute substantial evidence for the ALJ's finding that once Petitioner recommitted to sobriety, she had only mild mental health limitations.  Instead, Petitioner highlights that (i) Dr. Sandford and Dr. Stephenson's opinions were consistent with each other, (ii) they were experts in disability evaluations, and (iii) the record shows Petitioner was experiencing moderate depression in the spring of 2017 immediately after a period of relapse.  Pt.'s Br. at 14 (Dkt. 18) and Pt.'s Reply at 7 (Dkt. 20).  These are all reasons that could have supported the ALJ in crediting Dr. Sanford and Dr. Stephenson.

The existence of evidence supporting an alternative outcome, however, does not automatically justify Petitioner to relief on appeal.  The role of the Court in reviewing the Social Security Commissioner's decisions is "a limited one."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The question on appeal is not whether substantial evidence exists to support the claimant's preferred findings, but whether substantial evidence supports the ALJ's findings.  *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997).  As long as the evidence rationally

**REPORT AND RECOMMENDATION - 27**

supports the ALJ's conclusions, these conclusions must be affirmed.  *Tommasetti v. Astrue*, 533

F.3d 1035, 1038 (9th Cir. 2008).  Petitioner has not carried her burden to establish error under

these standards.

 5.  The Medical Evidence Regarding Petitioner's November 2, 2016 Fall

 Petitioner's fifth argument is that the ALJ committed reversible error in failing to

mention the opinions of Dr. Stuart Denny and Dr. Connor W. Quinn.  Both Dr. Denny and Dr.

Quinn treated Petitioner after her November 2, 2016 fall.

 Dr. Denny is a specialist in occupational medicine who treated Petitioner for back pain

from November 11, 2016 to December 9, 2016.  AR 436-447.  During this period, Dr. Denny

completed several interim and evolving Work Status Reports.  AR 471-475.  These reports

indicate that Petitioner's back pain limited her ability in various ways, including preventing her

from frequently bending and stooping.  *Id.*  Petitioner maintains that the ALJ should have

discussed these reports.

 Even if this is true, that does not entitle Petitioner to a remand.  As the party attacking the

agency's determination, the burden is on Petitioner to show prejudice resulting from the errors of

which she complains.  *Ludwig*, 681 F.3d at 1053; *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir.

2011).  While this standard is not high, neither is it toothless.  Where an ALJ errs in failing to

discuss testimony, that error will be harmless if the court can "confidently conclude that no

reasonable ALJ, when fully crediting the testimony, could have reached a different disability

determination."  *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015).

 Petitioner has not and cannot establish such prejudice.  As Respondent emphasizes, Dr.

Denny's opinions were time limited.  Each Work Status Report has a box stating when the

restrictions on the form begin and end.  Dr. Denny's last Work Status Report includes limitations

for November 29, 2016 to December 6, 2016.  AR 475.  After that date, Dr. Denny saw

Petitioner one final time at which he released her "to work at Full Duty."  AR 447.  The same

day as this final visit Dr. Denny filled out medical notes and paperwork stating that Petitioner

was expected to reach maximum medical improvement with her regard to her back strain by

December 12, 2016.  AR 447, 476.  Dr. Denny further opined that Petitioner did not have a

permanent impairment to her back caused by the fall.  *Id.*  These records unquestionably show

that, as it relates to her back strain, Petitioner had fully recovered from her fall by mid-December

2016, about a month after the initial injury.  The ALJ's failure to discuss this portion of the

medical history was, therefore, harmless.

Similar reasoning applies to Petitioner's arguments about Dr. Quinn.  Dr. Quinn is an

orthopedic surgeon who performed the surgery to correct Petitioner's right arm fracture.  The

surgery occurred on December 8, 2016.  AR 369.  On February 23, 2017, Petitioner returned to

Dr. Quinn's office for a follow-up visit related to the surgery.  AR 508-511.  At this visit,

Petitioner asked about documentation to return to work on a light-duty status.  AR 510.  After

inspecting Petitioner's arm and talking with her about continued pain, Dr. Quinn "advised

[Petitioner] to continue performing physical activity as tolerated; using pain as a guide."  *Id.*  He

further noted that Petitioner "may gradually begin to increase use of her right wrist, and I believe

her pain will continue to gradually decrease over time.  I will document and authorize the

patient's return to work at light duty lifting less than 10 lbs with frequent breaks and can return

to work in 2 weeks with these restrictions; although I encourage her to refrain from overexerting

herself, as this may cause exacerbation of [symptoms] or delayed healing."  *Id.*  Petitioner argues

that the ALJ committed reversible error in failing to mention or discuss this opinion.

**REPORT AND RECOMMENDATION - 29**

Petitioner fails, however, to explain how this error is harmful.  Pt.'s Reply at 8 (Dkt. 20).

As best the undersigned can tell, Petitioner's position is that "completely ignoring" Dr. Quinn

constituted harmful error as a matter of law.  This argument is legally and factually flawed.

First, the Ninth Circuit has rejecting the position that failing to discuss probative evidence

is automatically harmful.  *See Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) (rejecting

the argument that an ALJ's failure to discuss material lay witness testimony constitutes "per se"

prejudice).  Second, the ALJ did not "completely" ignore Dr. Quinn's opinions as Petitioner

suggests.  While the ALJ did not discuss Dr. Quinn's February 23, 2017 office visit, the ALJ did

discuss Petitioner's final meeting with Dr. Quinn, which occurred on March 23, 2017.  AR 22

(discussing AR 512, 514).  The ALJ found that this examination showed that Petitioner's right

forearm had largely recovered four months after the surgery.  AR 22.  As the ALJ summarized it,

Petitioner's right forearm revealed no diagnostic signs of abnormality, the hardware was intact

and in good condition, while Petitioner subjectively reported pain, the objective examination

"documented functioning that was well within functional limit," including full muscle strength in

the right forearm, full pronation and supination, intact light touch sensation, generally intact

forearm motor function, and no signs of tenderness.  *Id.*  In short, the ALJ considered Dr.

Quinn's final assessment of Petitioner's arm fracture and found that the fracture had healed well

with little to no remaining functional limitations.

Petitioner has not shown that further discussion of Dr. Quinn's opinions about

Petitioner's functioning earlier in the recovery process would have had any impact on the ALJ's

**REPORT AND RECOMMENDATION - 30**

reading of the March 23, 2017 record or any bearing on the ultimate disability determination.[15]
This claim of error, therefore, fails.

6. <u>The ALJ's Rejection of Dr. Bell's Pain Assessment</u>

Petitioner's sixth argument is that the ALJ did not provide legitimate reasons for rejecting
Dr. Bell's January 1, 2019 Clinical Assessment of Pain.  Pt.'s Br. at 15-16 (Dkt. 18).  Because
this case was filed after March 17, 2017, the newer rules for the evaluation of treating sources
apply to this case.  20 C.F.R. § 404.1520c; *see also* Pt.'s Br. at 14 (Dkt. 18).

The lynchpin for evaluating all medical opinions under these rules is "persuasiveness."
20 C.F.R. § 404.1520c(a).  When determining which medical opinions to credit, an ALJ
evaluates how persuasive each medical opinion is by considering: (i) supportability, (ii)
consistency, (iii) relationship with the claimant, (iv) specialization, and (v) any "other factors
that tend to support or contradict a medical opinion."  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The
ALJ's duty to articulate a rationale for each factor varies. 20 C.F.R. §§ 404.1520c(a)-(b).

---

[15] A cursory review of the record undermines any arguments Petitioner could have raised (but
elected not to) to the contrary.  Not only did the ALJ consider Dr. Quinn's final assessment of
Petitioner's arm function, but every doctor who opined on the anticipated or actual consequences
of Petitioner's right arm fracture, including two other orthopedic surgeons, determined that once
Petitioner recovered from surgery, the fracture should not or would not prevent her from
returning to her normal employment.  *See* Report of Consultant Spencer D. Greendyke M.D., AR
381-382 (explaining that Petitioner would likely be able to return to full work duties 6 weeks
postoperatively); Worker's Compensation Report, AR 392 (Dr. Anderson, the first orthopedic
surgeon to treat Petitioner, opined that it would be two months "post-op" before Petitioner could
lift more than 1-2 pounds, but after that she would be able to gradually increase her lifting and
could anticipate "full work release" three months "post-op"); Dr. Vu's Interrogatories, AR 1007
(concluding that Petitioner's right arm was not "showing any significant symptom recurrence or
serious need for revision" and that Petitioner could engage in a range of light work); Dr. Leslie
Arnold's Consulting Opinion, AR 71-72, 76-77 (same); Dr. Lee Lindquist's Consulting Opinion,
AR 89-90, 95-96 (same).  The ALJ expressly relied on three of these opinions – the opinions of
Dr. Vu, Dr. Arnold, and Dr. Lindquist – in finding Petitioner's right arm fracture did not keep
her from working as a waitress or a cashier.  AR 23-24.

**REPORT AND RECOMMENDATION - 31**

Here, the ALJ provided two reasons for rejecting Dr. Bell's opinions: (1) lack of evidence to support the opinion and (2) inconsistency with the record as a whole.  AR 25.  The first reason was a sufficient reason standing alone for the ALJ to reject Dr. Bell's opinions.  As the ALJ emphasized, the Clinical Pain Assessment is "one page in its entirety," without much space for Dr. Bell to explain his check-box answers.  AR 25.  In the one place on the form where Dr. Bell could include an explanation, Dr. Bell neither provided nor identified any "objective evidence to support his opinions."  AR 25.  Specifically, in the box asking Dr. Bell to list the impairments that caused or explained Petitioner's pain, Dr. Bell wrote "general activity."  AR 914.  As respondent emphasizes, Dr. Bell failed to identify any medical impairment to account for or explain Petitioner's putative limitations.

The ALJ's decision not to accept such a brief, conclusory, and unsupported opinion was more than reasonable.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings"); *Holohan v. Massanari*, 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001) (a medical opinion is "entitled to little if any weight" where the physician "presents no support for her or his opinion"); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (the ALJ permissibly rejected "check-off reports that did not contain any explanation of the bases of their conclusions"); *Stout v. Comm'r, Social Sec.*, 191 F. App'x 554, 556 (9th Cir. 2006) (unpublished) (the ALJ "correctly" granted a medical source statement little or no probative weight where the form was "clearly designed to promote a finding of disability based on quickly

made check marks, rather than to articulate any specific and personalized work related restrictions with a supporting rationale").[16]

   7.   <u>Whether the RFC Reflected Petitioner's Right Arm Fracture</u>

      Petitioner's penultimate argument shares DNA with her first argument. Petitioner contends that the ALJ erred in finding that her right arm fracture was a severe impairment without incorporating any limitations into the RFC to reflect this impairment. Pt.'s Br. at 16-17 (Dkt. 18). Petitioner's argument suffers from a fatal factual defect. Contrary to Petitioner's assertion, the ALJ did include limitations into the RFC associated with Petitioner's severe right arm fracture. Specifically, the ALJ found that Petitioner "should never" climb ladders, ropes, or scaffolds "because of her history [of] severe right forearm fracture." AR 22. Before and after this finding, the ALJ spent over two pages discussing the medical evidence regarding Petitioner's arm fracture and explaining why her arm functioning was otherwise normal. AR 21-24. Petitioner has not challenged this reasoning or shown that the ALJ misconstrued the evidence.

   8.   <u>Petitioner's Past Relevant Work</u>

      Petitioner's eighth argument is that the ALJ erred in finding that Petitioner former employment as a waitress, a cashier, and a floral salesperson constituted past relevant work. Employment is considered to be past relevant work if it is "work that [the claimant has] done

---

[16] Petitioner's assertion that the ALJ should have contacted Dr. Bell for further details ignores the fact that Dr. Bell died prior to the disability hearing. AR 45. Even if Dr. Bell were available, a medical assessment that is as brief and conclusory as Dr. Bell's does not trigger an ALJ's duty to request additional explanation. *Thompson v. Saul*, 796 Fed. Appx. 953, 954 (9th Cir. 2020) (unpublished) (the ALJ had no duty to further develop the record regarding a treating psychiatrist's brief, conclusory, and unsupported opinion); *see also Lester v. Astrue*, No. CV 09-7910-JEM, 2010 WL 5348610, at *5 (C.D. Cal. Dec. 21, 2010) ("It cannot be the case that every time a medical opinion lacks adequate clinical support the ALJ has a duty to develop it further.").

within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560.  In turn, substantial gainful activity is defined as "work activity that involves doing significant physical or mental activities," and which "is the kind of work usually done for pay or profit."  20 C.F.R. § 404.1572.  Work may be substantial gainful activity even if it is done on a part-time basis.  *Id.*

Petitioner has not shown that the ALJ committed reversible error in finding her work as a waitress qualified as "past relevant work" under these standards.  With regard to this job, the ALJ found that (i) Petitioner had worked as a waitress in the last 15 years, (ii) Petitioner's testimony and earnings showed her waitressing work was substantial gainful activity ("SGA"), and (iii) that while her work history was sporadic at time, she had worked as a waitress long enough to learn the job.  AR 26.  Petitioner does not dispute and the record is clear that Petitioner worked as a waitress within the 15-year period.  AR 37.

As for the second and third findings, Petitioner summarily argues that it is impossible to tell if the ALJ's conclusions are correct based on the record provided.  Pt.'s Br. at 18 (Dkt. 18).  Petitioner, however, does little to expound this argument.  Petitioner does not cite to any of the case law or regulations detailing when employment does and does not constitute substantial gainful employment.  Nor does Petitioner engage with the evidence regarding her work history, including her testimony, her yearly earnings statements, and her job history.  In short, Petitioner does nothing to show that the ALJ's conclusions were incorrect or unreasonable.

Petitioner, instead, asks this Court to reverse the ALJ's decision on the basis that the ALJ did not do enough to show her work.  Petitioner does not identify any authority reversing an ALJ's otherwise legitimate conclusions about what constitutes past relevant work on this basis.  The Ninth Circuit implicitly rejected this approach in *Lewis v. Apfel*, 236 F.3d 503, 515 (9th Cir.

**REPORT AND RECOMMENDATION - 34**

2001).  In that case, the ALJ conducted a spare analysis at Step Four finding that the petitioner

could continue working at McDonald's, his then part-time occupation, with increased work hours

"consistent with the regulations relative to gainful work activity."  *Id.* at 515.  The Ninth Circuit

found that these bare findings, which did not even use the term "past relevant work," were

sufficiently clear for the Court to conclude that the ALJ had found the claimant's work at

McDonald's was substantial and gainful.  *Id.*  The Court proceeded to assess the merits of the

ALJ's finding and only reversed the ALJ's decision after concluding the earning information

triggered a presumption against substantial gainful activity that the Commissioner did not rebut.

*Id.* at 515-517.

As this case indicates, when a Petitioner challenges an ALJ's findings about what

constitutes substantial gainful activity or past relevant work, the Petitioner must show that these

conclusions were erroneous.  This should not be unsurprising.  As the party appealing the

Commissioner's decision, it is Petitioner's responsibility to show both error <u>and</u> prejudice.  *See*

*Ludwig*, 681 F.3d at 1053 (in a social security appeal, "[t]he burden is on the party claiming error

to demonstrate not only the error, but also that it affected his 'substantial rights,' which is to say,

not merely his procedural rights").

Here, even if Petitioner is correct that the ALJ's decision is underexplained, Petitioner

has not shown how that mattered to the ultimate outcome of the case.[17]

---

[17] *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) does not alleviate Petitioner of
this burden.  *Chenery* holds that a reviewing court may only affirm agency action on "the
grounds invoked by the agency." *Marsh*, 792 F.3d at 1172 (citing *Chenery*, 332 U.S. at 196).
The Ninth Circuit, however, has repeatedly refused read the word "grounds" so broadly as to
eliminate harmless error review for poorly explained ALJ findings. *Id.* (*Chenery* did not
preclude the district court from finding that specific medical records provided minimal insight
into the claimant's condition and that the ALJ's failure to discuss these records was therefore
harmless); *Molina*, 674 F.3d at 1121 ("[e]ven when an agency explains its decision with less than
ideal clarity, we must uphold it if the agency's path may reasonably be discerned").

**REPORT AND RECOMMENDATION - 35**

The undersigned agrees with Respondent that such harm is not apparent from the record. It is undisputed that Petitioner held numerous jobs as a waitress between 2005 and 2016.  AR 51-59, 294-301.  At the disability hearing, Petitioner affirmatively testified that waitressing was her "primary" means of employment during these years.  AR 37.  This included working full-time at a Perkins restaurant during different stints in 2005 and 2006.  AR 52, 56.  Based on these experiences, Petitioner was able to testify at her disability hearing regarding the skills required to be a waitress.  AR 37-38.  This testimony and these records clearly support the ALJ's finding that Petitioner worked long enough as a waitress to learn the job.

Turning to whether the job rose to the level of substantial gainful activity, the inquiry is admittedly more complicated.  Because the record only contains yearly earnings and Petitioner moved between jobs frequently, it not clear what Petitioner's monthly income was when she was waitressing.[18]  This is not, however, a basis for automatic reversal.  It is Petitioner's burden at Step Four to show she cannot return to her prior employment.  *Lewis*, 236 F.3d at 515.  Where the record contains information showing sufficiently low average monthly earnings, that burden may be shifted to the Commissioner.  *Id.*  In all other cases, however, "the claimant must produce evidence that he or she has not engaged in substantial gainful activity; if there is no such evidence, the ALJ may find that the claimant has engaged in such work."  *Id.*  In other words, in the absence of more detailed earning data, it was claimant's burden to show that waitressing, a job that is typically done for profit not as a hobby, was not substantial gainful employment.

---

[18] The regulations contain monthly income levels that presumptively qualify or disqualify employment as substantial gainful activity.  *See* 20 C.F.R. § 404.1574(b).  These income levels are calculated by averaging a claimant's monthly earning for a particular job over the period that job was worked.  20 C.F.R. § 404.1574a(c); *see also Ramirez v. Colvin*, No. CV 13-4396-DFM, 2014 WL 292016, at *2-3 (C.D. Cal. Jan. 27, 2014) (compiling cases explaining how average earning should be calculated).

**REPORT AND RECOMMENDATION - 36**

Despite multiple opportunities to do so, Petitioner produced no evidence to satisfy this burden.  Specifically, on her written work history disclosure, Petitioner denied having prior employment, even though this was clearly not the case.  AR 281.  In her oral interview, Petitioner acknowledging having prior employment as a waitress, but claimed not to remember the jobs or her employers.  AR 221.  These responses deprived the ALJ of the very information (more precise dates of prior employment) she now faults the ALJ for not considering.  Petitioner had an opportunity to fix this mistake at the disability hearing.  But her testimony at this hearing weakened rather than furthered her cause.

In response to her counsel's and the ALJ's inquiries, Petitioner agreed that waitressing was her primary type of employment and that she had at least one job working as a waitress full time.  AR 37, 52.  Based on this testimony and on her earnings statements, the ALJ reasonably concluded that Petitioner's work as a waitress was substantial gainful employment.[19]  Petitioner has identified no reason to believe that further development of the record would result in a different outcome.  Petitioner is not, consequently, entitled to a remand on this matter.  *See Ludwig*, 681 F.3d at 1053 (holding that a "claimant need not necessarily show what other evidence might have been obtained had there not been error, but does have to show at least a 'substantial likelihood of prejudice'"); *see also McLeod*, 640 F.3d at 888 (warning that the "mere" possibility that further evidence might establish prejudice to the claimant is not enough to warrant a remand).

---

[19] In 2006, for example, Petitioner worked as a kitchen worker, a stocker, a hostess, a cashier, and a waitress at two different restaurants.  AR 295.  Petitioner's combined income from these jobs was $19,704.65, well over the presumptive level for substantial gainful activity.  AR 295 and 20 C.F.R. § 416.974(b)(2)(ii)(B).  This strongly indicates Petitioner was working in each job, including the waitressing jobs, at a substantial and gainful level.

**REPORT AND RECOMMENDATION - 37**

## RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that the decision of the Commissioner be **AFFIRMED**, that Petitioner's Petition for Review (Dkt. 1) be **DENIED**, and this action be **DISMISSED** in its entirety, with prejudice.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days . . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

DATED: November 19, 2021

Raymond E. Patricco
U.S. Magistrate Judge

**REPORT AND RECOMMENDATION - 38**